NBRJCHAP

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

           v.                          22 Cr. 303 (JMF)

GUSTAVO CHAVEZ,

                                     Plea
          Defendant.
------------------------------x

                                New York, N.Y.
                                November 27, 2023
                                3:00 p.m.

Before:

                    HON. JESSE M. FURMAN,

                                  District Judge

                        APPEARANCES

DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
ANDREW JONES
     Assistant United States Attorney

DAVID E. PATTON
     Federal Defenders of New York, Inc.
     Attorney for the Defendant
ANDREW J. DALACK

Also Present:

Jill Hoskins, Interpreter (Spanish)

NBRJCHAP

1              THE COURT:  Good afternoon.

2              This is the matter of *United States v. Chavez*, 23 Cr.

3    303.

4              Counsel, please state your names for the record.

5              MR. JONES:  Good afternoon, your Honor.

6              Andrew Jones for the government.

7              MR. DALACK:  Good afternoon.

8              Andrew Dalack from the Federal Defenders of New York

9    on behalf of Gustavo Chavez.

10             THE COURT:  Good afternoon to everyone.

11             Mr. Dalack, you're sporting a new longer beard.

12             MR. DALACK:  Some travel overseas I'm hoping it will

13   be useful for.

14             THE COURT:  Very good.

15             We are joined here by a Spanish language interpreter.

16   Let me just confirm with Mr. Chavez that he's able to

17   understand the interpreter and the headphones are working.

18             THE DEFENDANT:  Yes.

19             THE COURT:  Okay.  If at any point you have any

20   trouble understanding, please let me know right away so we can

21   take care of the problem.  Understood?

22             THE DEFENDANT:  Yes, sir.

23             THE COURT:  All right.  We are here because I

24   understand Mr. Chavez wishes to change his plea and enter a

25   plea of guilty to a lesser-included offense to Count One of the

NBRJCHAP

1    indictment, 22 Cr. 303; is that correct, Mr. Dalack?

2              MR. DALACK:  Yes, your Honor.

3              THE COURT:  All right.  Before I accept your guilty

4    plea, Mr. Chavez, I need to ask you certain questions to ensure

5    that you are pleading guilty because you are, in fact, guilty

6    and not for some other reason.

7              To ensure that you understand the rights that you

8    would be giving up by pleading guilty and to ensure that you

9    understand the consequences of a guilty plea, it is critical

10   that you understand each question before you give me an answer.

11   So if there's any question you do not understand, please let me

12   know so that Mr. Dalack or I can explain it to you more fully.

13   And if at any point you wish to speak to Mr. Dalack for any

14   reason, let me know and I will give you however much time you

15   need to speak with him.

16             Do you understand all that?

17             THE DEFENDANT:  Yes.

18             THE COURT:  All right.  Could you please rise and

19   raise your right hand and I'll administer the oath to you.

20             (Defendant sworn)

21             THE COURT:  You may be seated.

22             You are now under oath, which means that if you answer

23   any of my questions falsely you may be subject to prosecution

24   for the separate crime of perjury.

25             Do you understand that?

NBRJCHAP

1          THE DEFENDANT:  Yes, sir.

2          THE COURT:  Can you tell me your full name, please.

3          THE DEFENDANT:  Gustavo Adolfo Chavez.

4          THE COURT:  How old are you?

5          THE DEFENDANT:  70.

6          THE COURT:  How far did you go in school?

7          THE DEFENDANT:  12 years, but in my country.

8          THE COURT:  And where was that?

9          THE DEFENDANT:  Nicaragua.

10          THE COURT:  And have you ever been treated or

11  hospitalized for any type of mental illness?

12          THE DEFENDANT:  I have not been inpatient, but I have

13  received treatment.

14          THE COURT:  And can you tell me briefly what you've

15  received treatment for and when.

16          THE DEFENDANT:  For depression.

17          THE COURT:  And when?

18          THE DEFENDANT:  That was about 10 -- 10, 12 years ago.

19          THE COURT:  Anything about either your depression or

20  the treatment you received that would affect your ability to

21  understand what's happening here today?

22          THE DEFENDANT:  No.  No.

23          THE COURT:  Are you now or have you recently been

24  under the care of a doctor or a mental health professional such

25  as a psychiatrist or psychologist?

NBRJCHAP

1          THE DEFENDANT:  Yes.  Yes.

2          THE COURT:  And can you tell me what for?

3          THE DEFENDANT:  I felt depressed.  You know, being

4    shut up in my house, I couldn't sleep.  So because of the

5    cancer treatment I received, it takes away my ability to sleep

6    well.

7          THE COURT:  All right.  And you're undergoing cancer

8    treatment now; is that correct?

9          THE DEFENDANT:  Yes.

10          THE COURT:  And is there anything about either your

11   cancer, the treatment, your depression, or any treatment that

12   you've received that would affect your ability to understand

13   what's happening here today?

14          THE DEFENDANT:  No.  I fully understand everything

15   that's happening.

16          THE COURT:  All right.  And have you ever been treated

17   or hospitalized for any type of addiction including drug or

18   alcohol addiction?

19          THE DEFENDANT:  Never, never.

20          THE COURT:  In the last 48 hours, have you taken any

21   medicine, pills, drugs, or had any alcohol?

22          THE DEFENDANT:  No.  No, I don't drink.

23          THE COURT:  Okay.  But have you taken any medicine in

24   the last 48 hours for your cancer or anything else?

25          THE DEFENDANT:  No.  Not for the cancer, but I took

NBRJCHAP

1   aspirin for my heart.

2           THE COURT:  And does that affect your ability to

3   understand what's going on here today?

4           THE DEFENDANT:  No.  No, not at all.

5           THE COURT:  Aside from the aspirin, any other drugs,

6   medicine, or pills that you've taken in the last 48 hours?

7           THE DEFENDANT:  High blood pressure pills.  It's

8   50 milligrams of losartan.

9           THE COURT:  All right.  And is your mind clear today?

10          THE DEFENDANT:  Yes, of course.

11          THE COURT:  And do you understand what's happening

12  here today?

13          THE DEFENDANT:  Yes, I do.

14          THE COURT:  Mr. Dalack, I see you've discussed this

15  matter with Mr. Chavez?

16          THE DEFENDANT:  Yes, I have, Judge.  And we have no

17  concerns about Mr. Chavez's competence or ability to execute

18  the pleaed today.  I do expect after the plea is accepted I

19  will address with the Court some issues concerning Mr. Chavez's

20  sort of general cognitive functioning and how they relate to

21  our application for continued bail under 3145(c), but none of

22  those issues affect Mr. Chavez's competence or his ability to

23  knowingly and voluntarily execute a plea today.

24          THE COURT:  Okay.  And in your judgment, does he

25  understand the rights that he would be giving up by pleading

NBRJCHAP

1    guilty?

2              MR. DALACK:  I believe he does, your Honor, yes.

3              THE COURT:  And does either counsel have any doubt as

4    to his competence to plead at this time?  I guess Mr. Dalack

5    already said no, but Mr. Jones?

6              MR. JONES:  No doubts, your Honor.

7              THE COURT:  Okay.  On the basis of Mr. Chavez's

8    responses to my questions, my observations of his demeanor here

9    in court, and the representations of counsel, I find that he is

10   fully competent to enter an informed plea of guilty at this

11   time.

12             Mr. Chavez, have you received a copy of the indictment

13   in this case, 22 Cr. 303 charging you with one count of

14   narcotics trafficking?

15             THE DEFENDANT:  Yes.

16             THE COURT:  And was it translated for you into

17   Spanish?

18             THE DEFENDANT:  Yes.

19             THE COURT:  Did you have enough time to discuss with

20   Mr. Dalack the charge to which you are pleading guilty and any

21   possible defenses to that charge?

22             THE DEFENDANT:  Yes.  Yes, your Honor.

23             THE COURT:  And has Mr. Dalack explained to you the

24   consequences of entering a guilty plea?

25             THE DEFENDANT:  Yes, of course.

NBRJCHAP

1          THE COURT:  Are you satisfied with his representation

2    of you?

3          THE DEFENDANT:  Yes, of course.

4          THE COURT:  All right.  I'm now going to explain

5    certain rights that you have.  These are rights that you would

6    be giving up by pleading guilty.  And again, it's important for

7    you to listen carefully, and if you don't understand something,

8    let me know so that Mr. Dalack or I can explain.

9          Under the Constitution and laws of the United States,

10   you have the right to plead not guilty to the charge in the

11   indictment.

12         Do you understand that?

13         THE DEFENDANT:  Yes.

14         THE COURT:  If you did plead not guilty, you would be

15   entitled to a speedy and public trial by a jury on the charge

16   in the indictment.

17         Do you understand that?

18         THE DEFENDANT:  Yes.

19         THE COURT:  At that trial, you would be presumed to be

20   innocent and you would not have to prove that you were

21   innocent.  Instead, the government would be required to prove

22   your guilt by competent evidence beyond a reasonable doubt

23   before a jury could find you guilty.

24         Do you understand that?

25         THE DEFENDANT:  Yes.

NBRJCHAP

```
 1                THE COURT:  In order to find you guilty, a jury of 12
 2   people would have to agree unanimously that you were guilty.
 3                Do you understand that?
 4                THE DEFENDANT:  Yes.
 5                THE COURT:  At that trial and at every stage of your
 6   case, you would be entitled to be represented by a lawyer, and
 7   if you could not afford a lawyer, one would be appointed at
 8   public expense free of cost to represent you.
 9                Do you understand that?
10                THE DEFENDANT:  Yes.
11                THE COURT:  During a trial, the witnesses for the
12   government would have to come to court and testify in your
13   presence, and your lawyer could cross-examine those witnesses
14   and object to any evidence offered against you.  You would also
15   have an opportunity to present evidence on your own behalf and
16   you would have the right to have subpoenas issued or other
17   process used to compel witnesses to come to court and testify
18   in your defense.
19                Do you understand all of that?
20                THE DEFENDANT:  Yes.
21                THE COURT:  At a trial, you would also have the right
22   to testify on your own behalf, but you would have the right not
23   to testify as well.  And if you chose not to testify, then no
24   one, including a jury, could draw any inference or a suggestion
25   of guilt from the fact that you did not testify.
```

NBRJCHAP

1          Do you understand that?

2          THE DEFENDANT:  Yes.

3          THE COURT:  Before trial, you would have an

4   opportunity, if you have not waived it, to seek supression or

5   exclusion of any evidence offered against you or that the

6   government would intend to offer against you at a trial.

7          Do you understand that?

8          THE DEFENDANT:  Yes.

9          THE COURT:  If you were convicted at a trial, you

10  would have the right to appeal that verdict and to appeal any

11  pretrial rulings that I have made in your case.

12          Do you understand that?

13          THE DEFENDANT:  Yes.

14          THE COURT:  If you plead guilty, you will also have to

15  give up your right not to incriminate yourself because I may

16  ask you or I will ask you questions to ensure that you are

17  pleading guilty because you are, in fact, guilty and not for

18  some other reason, and you will have to admit and acknowledge

19  your guilt.

20          Do you understand that?

21          THE DEFENDANT:  Yes.

22          THE COURT:  If you plead guilty and if I accept your

23  guilty plea, you will give up your right to a trial and the

24  other rights that we have just discussed other than your right

25  to a lawyer, which you keep whether or not you plead guilty,

NBRJCHAP

```
 1    but there will be no trial and I will enter a judgment of
 2    guilty and sentence you on the basis of your plea after I have
 3    received a presentence report prepared by the United States
 4    Probation Department and any submissions that I get from your
 5    lawyer and the government's lawyer.  There will be no appeal
 6    with respect to whether you did or did not commit the offense
 7    to which you're pleading guilty or with respect to whether the
 8    government could use the evidence that it has against you.
 9              Do you understand all of that?
10              THE DEFENDANT:  Yes.
11              THE COURT:  Even now, as you are entering this plea,
12    you have the right to change your mind, to plead not guilty,
13    and to go to trial on the charge in the indictment.
14              Do you understand that?
15              THE DEFENDANT:  Yes.
16              THE COURT:  Do you understand each and every one of
17    the rights that I've just explained to you?
18              THE DEFENDANT:  Yes.
19              THE COURT:  And are you willing to give up your right
20    to a trial and any other rights that we've just discussed?
21              THE DEFENDANT:  Yes.
22              THE COURT:  All right.  Now, do you understand that
23    you are charged in Count One of the indictment with
24    distributing or possessing with the intent to distribute a
25    controlled substance, namely, 400 grams or more of fentanyl in
```

NBRJCHAP

violation of 21, U.S. Code, Section 812, 841(a)(1), and

841(b)(1)(A).

Do you understand that that is the charge in the

indictment?

THE DEFENDANT:  Yes.

THE COURT:  And do you understand that the government

has agreed to accept a plea to a lesser-included offense,

namely, distribution or possession with the intent to

distribute a detectable amount of fentanyl, which is in

violation of the same provisions, but instead of 841(b)(1)(A),

it's 841(b)(1)(C).

Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  All right.  Mr. Jones, would you please

state the elements of that offense.

MR. JONES:  Yes, your Honor.

The lesser-included offense has three elements:

The first is that the defendant knowingly and

intelligently possessed a controlled substance; second, he

possessed the controlled substance with the intent to

distribute it; and, third, that the substance was, in fact,

fentanyl.  Additionally, we would have to prove venue in the

Southern District of New York.

THE COURT:  Do you understand that, if you were to go

to trial, that the government would have to prove those first

NBRJCHAP

1    three elements Mr. Jones said beyond a reasonable doubt to

2    convict you of the offense to which you're pleading guilty?

3              Do you understand that.

4              THE DEFENDANT:  Yes.

5              THE COURT:  And in addition, the government would have

6    to prove that venue was proper in this district, that is, that

7    something in connection with the offense occurred in this

8    district, but its burden on that would be a preponderance of

9    the evidence, but not beyond a reasonable doubt.

10             Do you understand that?

11             THE DEFENDANT:  Yes.

12             THE COURT:  All right.  Let me tell you now about the

13   maximum possible punishment for this crime.  And by "this

14   crime" I mean the lesser-included offense to which you're

15   pleading guilty, and by "maximum" I mean the most that could

16   possibly be imposed upon you.  It doesn't mean that that is the

17   sentence you will receive, but you do have to understand that

18   by pleading guilty you are exposing yourself to a combination

19   of punishments up to the statutory maximums.

20             Do you understand that?

21             THE DEFENDANT:  Yes.

22             THE COURT:  All right.  First, let me tell you about

23   the possible restrictions on your liberty.  The maximum term of

24   imprisonment for this crime is 20 years in prison, which could

25   be followed by up to a lifetime term of supervised release.

NBRJCHAP

1    Supervised release means that you would be subject to

2    supervision by the probation department.  There would be rules

3    of supervised release that you would be required to follow, and

4    if you violated any of those rules, you could be returned to

5    prison to serve additional time without a jury trial and

6    without credit for the time you served on your underlying

7    sentence or time spent on post-release supervision.

8              Do you understand all that?

9              THE DEFENDANT:  Yes.

10             THE COURT:  There is no parole in the federal system,

11   which means that if you were sentenced to prison, you would not

12   be released early on parole.  There is a limited opportunity to

13   earn credit for good behavior, but if you were sentenced to

14   prison, you would have to serve at least 85 percent of the time

15   to which you were sentenced.

16             Do you understand that?

17             THE DEFENDANT:  Yes, your Honor.

18             THE COURT:  In addition to these restrictions on your

19   liberty, the maximum possible punishment also includes certain

20   financial penalties.  First, the maximum allowable fine is the

21   greatest of $1 million or twice the gross pecuniary or

22   financial grain derived from the offense or twice the gross

23   pecuniary loss to one other than you as a result of the

24   offense; second, I can order restitution to any person or

25   entity injured as a result of your criminal conduct; third, I

NBRJCHAP

1    can order you to forfeit all property derived from the offense

2    or used to facilitate or commit the offense; and, finally, I

3    must order a mandatory special assessment of $100.

4         Do you understand that those are the maximum possible

5    penalties?

6         THE DEFENDANT:  Yes.

7         THE COURT:  In addition, you should understand that

8    this crime carries a mandatory minimum of three years of

9    supervised release, that is to say that absent a basis for

10   relief from the mandatory minimum, I would be required to

11   impose at least three years of supervised release following any

12   term of imprisonment.

13        Do you understand that?

14        THE DEFENDANT:  Yes.

15        THE COURT:  All right.  Are you a citizen of the

16   United States, Mr. Chavez?

17        THE DEFENDANT:  No.

18        THE COURT:  You understand that as a result of your

19   guilty plea there may be effects on your immigration status in

20   this country.  For instance, you may be detained by immigration

21   authorities following the completion of any sentence, you may

22   be removed from the United States, you may be denied admission

23   in the United States in the future, and you may be denied

24   citizenship in the United States.  Do you understand that those

25   are among the kinds of immigration consequences that may follow

NBRJCHAP

1    from a guilty plea?

2              THE DEFENDANT:  Yes.

3              THE COURT:  And have you discussed the possible

4    immigration consequences of your plea with Mr. Dalack?

5              THE DEFENDANT:  Yes.

6              THE COURT:  Do you understand that as a result of your

7    guilty plea, you may also lose certain rights that you have in

8    this country, to the extent that you have them, or could

9    otherwise obtain them such as the right to vote, the right to

10   hold public office, the right to serve on a jury, and the right

11   to possess any kind of firearm.

12             Do you understand that?

13             THE DEFENDANT:  Yes.

14             THE COURT:  Are you serving any other sentence, either

15   state or federal, or being prosecuted in any other court at

16   this time?

17             THE DEFENDANT:  No.

18             THE COURT:  Do you understand that if Mr. Dalack or

19   anyone else for that matter has attempted to predict what your

20   sentence will be in this case, that their predictions could be

21   wrong?  Do you understand that?

22             THE DEFENDANT:  Yes.

23             THE COURT:  It's important to understand that no one,

24   not your lawyer, not the government's lawyer, no one can give

25   you any promise or assurance as to what your sentence will be

NBRJCHAP

in this matter because your sentence will be determined by me

and by me alone, and I'm not going to do that today.  Instead,

I will wait until I receive the presentence report that the

probation department will prepare.  I will do my own

calculation of how the United States Sentencing Guidelines

apply to your case.  I will consider any possible departures

from the guidelines range.  I'll consider any submissions I get

from the lawyers, and, ultimately, I will consider the factors

that are set forth in the statute that governs sentencing 18,

U.S. Code, Section 3553(a).  I'll do all of that before I

determine and impose an appropriate sentence on you.

          Do you understand that?

          THE DEFENDANT:  Yes.

          THE COURT:  And have you discussed that process, the

sentencing process with Mr. Dalack?

          THE DEFENDANT:  Yes.

          THE COURT:  Now, even if your sentence is different

from what Mr. Dalack or anyone else has told you that it might

be, even if it is different from what you hope or expect it to

be, and even if it is different from what may be in the plea

agreement we'll discuss in one moment, you will still be bound

by your guilty plea and you will not be allowed to withdraw

your plea.

          Do you understand that?

          THE DEFENDANT:  Yes, of course.

NBRJCHAP

THE COURT:  Now, I understand that there is a written
plea agreement that you and Mr. Dalack have entered into with
the government; is that correct?

THE DEFENDANT:  Yes.

THE COURT:  I have an original letter plea agreement
here dated November 20, 2023, signed by Mr. Jones, addressed to
Mr. Dalack.  Turning to the last page, it appears, Mr. Chavez,
that you signed this plea agreement dated today, November 27.
Is that your signature on the last page, if you can see it from
there?

THE DEFENDANT:  Yes.

THE COURT:  And before you signed the plea agreement,
did you read it?  Or was it interpreted for you into Spanish?

THE DEFENDANT:  Yes.

THE COURT:  And before you signed it, did you discuss
it with Mr. Dalack?

THE DEFENDANT:  Yes.

THE COURT:  Before you signed it, did Mr. Dalack
explain it to you and answer any questions you may have had
about the plea agreement?

THE DEFENDANT:  Yes.

THE COURT:  And before you signed the plea agreement,
did you fully understand it?

THE DEFENDANT:  Yes.

THE COURT:  Now, one of the features of your agreement

NBRJCHAP

with the government is that you and the government have agreed

upon how the United States Sentencing Guidelines apply to your

case; is that correct?

THE DEFENDANT:  Yes.

THE COURT:  It's important for you to understand that

that agreement is binding on you and it is binding on the

government, but it's not binding on me.  I have my own

independent obligation to determine what the direct guidelines

range is.  I'm not suggesting to you that I will calculate the

range differently, but if I did and even if I calculated a

higher range than the one to which you've agreed, you would

still be bound by your guilty plea and you would not be allowed

to withdraw your plea.

Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  Another feature of your agreement is that

you admit to the forfeiture allegation with respect to Count

One of the indictment.

Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  And do you, in fact, admit to the

forfeiture allegation with respect to Count One?

THE DEFENDANT:  Yes.

THE COURT:  Now, one final provision of this agreement

that I want to bring to your attention is that you agree to

NBRJCHAP

```
1   waive or give up your right to appeal or otherwise challenge
2   any sentence that is within or below the stipulated sentencing
3   guidelines range of 87 to 108 months' imprisonment.  That means
4   that if I were to sentence you to 108 months in prison or
5   anything less than that, that you would have no right to appeal
6   or otherwise challenge that sentence.
7           Do you understand that?
8           THE DEFENDANT:  Yes.
9           THE COURT:  Does this written plea agreement
10  constitute your complete and total understanding of the entire
11  agreement between you and the government?
12          THE DEFENDANT:  Yes.
13          THE COURT:  Has anything been left out of this written
14  plea agreement?
15          THE DEFENDANT:  No.
16          THE COURT:  Other than what is written in this
17  agreement, has anyone made any promise to you or offered you
18  any inducement to plead guilty or to sign the plea agreement?
19          THE DEFENDANT:  No.
20          THE COURT:  And has anyone threatened you or forced
21  you to plead guilty or to sign the plea agreement?
22          THE DEFENDANT:  No.
23          THE COURT:  Has anyone made a promise to you as to
24  what your sentence will be?
25          THE DEFENDANT:  No.
```

NBRJCHAP

1    THE COURT:  All right.  Having asked you all those

2    questions, Mr. Chavez, at this time I would ask you how do you

3    plead to the lesser-included offense to Count One, guilty or

4    not guilty?

5    First, Mr. Chavez, just is it correct that you plead

6    guilty to the lesser-included offense that I described earlier?

7    THE DEFENDANT:  Yes.

8    THE COURT:  Okay.  And now can you tell me in your own

9    words what you did that makes you believe that you are guilty

10   of that crime?  And if you prefer to read from prepared

11   remarks, that's also fine, just read slowly and clearly and

12   wait for the interpreter to catch up to you, okay?

13   THE DEFENDANT:  Okay.

14   THE COURT:  All right.  Once the interpreter is in

15   position, you may proceed.

16   THE DEFENDANT:  On April 28, 2022, I received a

17   package from someone and I agreed to take it to my home and to

18   keep it there until another person would arrive to pick it up

19   in my apartment, and my apartment is in the Bronx.  I didn't

20   know what was inside the package, but I had a reason to believe

21   that it contained drugs.  I thought that not looking at what

22   was inside the package, that way I wasn't violating any law,

23   but I now know that what I did was wrong.

24   I should never have accepted the package.  I am very

25   sorry for having done this.  I am not a drug trafficker, and I

NBRJCHAP

1   feel very bad for having been involved in this case.  May God

2   have mercy on me.

3          THE COURT:  All right.  Let me ask you a couple of

4   followup questions, if I can.

5          THE DEFENDANT:  Yes.

6          THE COURT:  First of all, I saw that you were reading

7   from a prepared set of remarks, which is certainly fine,

8   indeed, quite common, just to make sure that you speak

9   accurately and clearly.  But just to confirm, what was written

10  in that document, that is all true and correct; is that true?

11         THE DEFENDANT:  Yes.

12         THE COURT:  All right.  Second, you said you had

13  reason to believe that the package contained drugs.  I just

14  want to understand exactly is it correct to say that while you

15  didn't know for sure, that you knew or believed that there was

16  some illegal drug in the package that you accepted; is that

17  correct?

18         THE DEFENDANT:  Well, I had reason to believe that the

19  package that I received on April 28, 2022 contained drugs

20  because --

21         THE INTERPRETER:  May the interpreter clarify?

22         THE COURT:  Yes.

23         THE DEFENDANT:  Because I had previously received a

24  package by mail.  I had opened it and saw that it contained

25  drugs.

NBRJCHAP

1          THE COURT:  All right.  And I take it you did not open

2     the package that you were given on April 28, 2022; is that

3     correct?

4          THE DEFENDANT:  Correct.

5          THE COURT:  And is that correct that you didn't do so

6     in part because you didn't want to find out exactly or confirm

7     your belief that there were drugs inside; is that correct?

8          THE DEFENDANT:  Yes.

9          THE COURT:  All right.  And I understand that at the

10    time you believed that because you avoided confirmation that it

11    was drugs, that you didn't believe at the time that you were

12    violating the law, but you understand and know now that that is

13    a violation of the law; is that correct?

14         THE DEFENDANT:  Yes.

15         THE COURT:  All right.  Mr. Jones, can you proffer

16    briefly what the contents of that package were, both its weight

17    and -- well, I guess weight is not critical, given the plea,

18    but what the contents were.

19         MR. JONES:  Yes, your Honor.

20         That package contained about 3 kilograms of controlled

21    substances.  I think it was two of fentanyl and one of fentanyl

22    analogue.

23         Just, if the case were to go to trial, I think in

24    further support of the idea that the defendant knew or at

25    minimum was willfully avoiding the knowledge that there was

NBRJCHAP

1    drugs in the box, I'd proffer at trial we'd put on evidence

2    that about two weeks earlier, he had delivered a measure of

3    fentanyl, about 6 grams of powder, I think about 100 grams of

4    pills to a DEA confidential source, which was ultimately the

5    reason he was under surveillance on April 28.  Also, following

6    his arrest on April 28, when the contents of the box were

7    seized, his apartment was searched and there was another

8    kilogram, give or take, of fentanyl or fentanyl analogue inside

9    of his apartment then.

10            THE COURT:  All right.  And doing this a little

11   backwards, but as long as you're standing and have proffered

12   some of it, can you tell me what the government would prove if

13   the defendant were to go to trial and what the evidence would

14   be and what it would show.

15            MR. JONES:  I think in addition to the things we just

16   mentioned, we'll put all that in through a combination of

17   surveillance video that would show the defendant having

18   received the box that he was arrested with on April 28.  I

19   would expect the confidential source that he had previously

20   given drugs to would testify, and law enforcement officers

21   would also testify about the fentanyl he was carrying that day.

22   We'd have lab reports to speak to the specific drugs that were

23   seized and expert testimony to back up the lab reports.

24            THE COURT:  All right.  A few questions, Mr. Dalack.

25   Number one, any dispute or objection that the government would

NBRJCHAP

1    prove that the package contained fentanyl?

2            MR. DALACK:  I do not dispute that, your Honor.

3            THE COURT:  Could you just use the mic.

4            MR. DALACK:  I do not contest that, Judge.

5            THE COURT:  And I assume you agree as a matter of law

6    that Mr. Chavez is accountable for that drug type, even if he

7    didn't know what the drug type was, that by virtue of the fact

8    that he was personally and directly involved in the

9    transaction, that he's on the hook for it?

10           MR. DALACK:  Yes, Judge.

11           THE COURT:  Okay.  I assume you also agree this

12   mistake of law, presuming that he did not believe at the time

13   that he was violating the law, that that is not a valid

14   defense; is that correct?

15           MR. DALACK:  That's correct, Judge.

16           THE COURT:  And finally, do you agree that his

17   allocution is sufficient to satisfy the knowledge requirement,

18   either directly or through a willful blindness theory?

19           MR. DALACK:  Yes, your Honor.

20           THE COURT:  All right.  And are you aware of any valid

21   defense that would prevail at trial or of any reason Mr. Chavez

22   should not be permitted to plead guilty to the lesser-included

23   offense?

24           MR. DALACK:  No, your Honor.  But we do look forward

25   to putting before the Court substantial mitigation concerning

NBRJCHAP

1    the offense conduct.

2              THE COURT:  Do both counsel agree there is a

3    sufficient factual basis for a guilty plea to the

4    lesser-included offense to Count One?

5              MR. JONES:  Yes, your Honor.

6              MR. DALACK:  Yes, Judge.

7              THE COURT:  Does either counsel know of any reason

8    that I should not accept the defendant's plea of guilty?

9              MR. JONES:  No.

10             MR. DALACK:  No, your Honor.

11             THE COURT:  Mr. Chavez, because you acknowledge that

12   you are, in fact, guilty to the lesser-included offense to

13   Count One as charged in the indictment, because I am satisfied

14   that you know of your rights including your right to go to

15   trial, and that you are aware of the consequences of your plea,

16   including the sentence that may be imposed upon you, and

17   because I find that you are knowingly and voluntarily pleading

18   guilty, I accept your guilty plea and enter a judgment of

19   guilty --

20             MR. DALACK:  Forgive me, your Honor.  I think there

21   might be an issue with the headphones.  It's been about a

22   minute that it stopped working.

23             THE INTERPRETER:  Apologies, your Honor.  It seems

24   that the interpreter inadvertently pressed the mute button.

25   The interpreter asked the defendant how long it had been that

NBRJCHAP

1    he was not hearing clearly.  He said about one minute.

2              THE COURT:  Could you maybe ask what was the last

3    thing that he did hear?

4              THE DEFENDANT:  No, I don't remember, but I

5    acknowledge -- I understand what I pled guilty to and what I

6    acknowledge and I'm very sorry.

7              THE COURT:  All right.  I suspect you may have missed

8    some of my back and forth with the lawyers.  Just they're

9    confirming that they agree that there is a sufficient factual

10   basis for a guilty plea.  And Mr. Dalack said that he was not

11   aware of any valid defense that would prevail at trial or of

12   any reason that you should not be permitted to plead guilty.

13             And then, perhaps most importantly, I then said and

14   will say again that because you acknowledged that you are, in

15   fact, guilty as to the lesser-included offense to Count One,

16   because I am satisfied that you know of your rights, including

17   your right to go to trial, and because you understand the

18   potential consequences of your plea, including the sentence

19   that may be imposed upon you, and because I find that you are

20   knowingly and voluntarily pleading guilty, I accept your guilty

21   plea and enter a judgment of guilty on the lesser-included

22   offense to Count One of the indictment.

23             Do you understand all that?

24             THE DEFENDANT:  Yes, I understood it perfectly.

25             THE COURT:  All right.  The probation department will

NBRJCHAP

1    want to interview you in connection with the presentence report

2    that it will prepare.  It is important that if you choose to

3    speak with the probation department, that anything you say is

4    truthful and accurate.  Among other things, that report is

5    important to me in deciding what sentence to impose upon you

6    before sentencing you, and Mr. Dalack will have an opportunity

7    to review the report.  I would urge you to review it with care,

8    and if you find any mistakes in the report or anything that you

9    wish to bring to my attention in connection with your

10   sentencing, that you share that with Mr. Dalack so he can share

11   with me in turn.

12          Do you understand that?

13          THE DEFENDANT:  Yes.

14          MR. DALACK:  I do wish to be present, your Honor, yes.

15          THE COURT:  I was about to ask you that.  I'll order

16   that no interview take place unless counsel is present.

17          Sentencing will be set for, let's say, March 7 at

18   3:00 p.m.  Again, March 7 at 3 p.m.

19          I direct the government to provide the probation

20   department with its factual statement of the offense within

21   seven days.  Defense counsel must arrange for Mr. Chavez to be

22   interviewed by probation within the next two weeks.  In

23   accordance with my individual rules and practices, defense

24   submissions with respect to sentencing are due two weeks prior

25   to sentencing, and the government's submissions due one week

NBRJCHAP

1    prior to sentencing.

2            That brings us to the issue of bail, which Mr. Dalack

3    alluded to earlier.  What is the government's position with

4    respect to bail?  Obviously, this is a 3143(a)(2) plea, but

5    what's the government's position?

6            MR. JONES:  Only that it is 3143(a)(2) and required

7    absent exceptional reasons, your Honor.

8            THE COURT:  Yes.  I meant 3143.  Thanks for the catch.

9            Mr. Dalack, tell me why you think under 3145(c)

10   release is appropriate.

11           MR. DALACK:  First, your Honor, as a threshold matter,

12   Mr. Chavez is able to establish by clear and convincing

13   evidence that he is not a danger to the community nor a flight

14   risk.  Mr. Chavez stands before the Court a 70-year-old man

15   without any criminal record whatsoever, certainly no record or

16   any indication that he has ever engaged in any act of violence

17   in his life.

18           This is his first and only interaction with the

19   justice system.  To give the Court a little bit of context and

20   color — and I expect to get into this in much more detail at

21   sentencing — at the time of Mr. Chavez's arrest, he was sort of

22   running an off-the-books taxi company to try and make some

23   extra money.  And in the course of operating that taxi company,

24   individuals that he doesn't know who they are would get his

25   number and ask him to deliver packages on their behalf.

NBRJCHAP

1          At one point, he discovered that the packages he was

2     being asked to — at least one of the packages — to hold on to

3     contained drugs in it.  And Mr. Chavez was nervous and scared

4     about what to do with that information and also mistakenly

5     believed that if he didn't look inside of the packages that he

6     wouldn't be violating the law.  Mr. Chavez obviously

7     understands now that that's not the way the law works, that

8     wouldn't be a defense at trial.

9          In informing his sort of judgment and decision making

10    with respect to his decision to receive packages and to

11    continue to hold on to them on behalf of people he didn't know,

12    I had Mr. Chavez evaluated by an experienced neuropsychologist

13    in connection with a mitigation submission I made to the U.S.

14    Attorney's Office.  While the neuropsychologist did not

15    determine that Mr. Chavez suffers from dementia, which was a

16    concern of ours, the neuropsychologist did determine that he

17    possesses a low fund of knowledge and that he has a low

18    intellectual ability and meets the criteria for a

19    neurocognitive disorder and intellectual disability and also a

20    panic disorder.  And as a result, Mr. Chavez struggles --

21          THE INTERPRETER:  Your Honor, could I ask the attorney

22    to start again with the diagnosis, perhaps just a little more

23    slowly.

24          MR. DALACK:  I had foreshadowed that would be a

25    problem today, so I apologize.

NBRJCHAP

1          Dr. Seltz, the neuropsychologist, that I retained,

2   indicates Mr. Chavez meets the criteria for a neurocognitive

3   disorder, an intellectual disability, and a panic disorder, and

4   that as a result, he struggles with higher order cognitive

5   functions, including exercising adequate abstract reasoning

6   skills, and he processes information much more slowly than

7   average.  His intellectual disability also manifests in

8   deficits in his reasoning, problem solving, planning, abstract

9   thinking, and judgment features of his mental health.  Your

10  Honor, that helps explain how he was able to rationalize his

11  offense conduct and delude himself into believing that he was

12  not breaking the law if he didn't look into the packages.

13          I expect that we're going to get into a lot more

14  detail at the time of sentencing about how these diagnoses not

15  only affect his culpability and mitigate his culpability with

16  respect to the offense, but why they weigh quite heavily in

17  favor of a nonincarceratory sentence, one of those rare

18  circumstances where a significant variance is present under

19  3553(a).

20          But separate and apart from the cognitive issues that

21  Dr. Seltz has diagnosed, Mr. Chavez also suffers from a host of

22  physical ailments.  As he alluded to earlier, he's previously

23  suffered from prostate cancer.  His PSA levels as of July of

24  this year have been elevated and he is due for another round of

25  lab work on January 2 to determine whether or not he requires

NBRJCHAP

1    additional rounds of chemotherapy or other more aggressive

2    treatment to deal with a possible reemergence of prostate

3    cancer.

4            In addition, he suffers from hypertension.  He's a

5    type 2 diabetic who requires pretty intensive medical treatment

6    and care.  He has sciatica that's related to his diabetes.  And

7    one of the reasons, one of the core reasons which pretrial

8    services had recommended and agreed to a substantial

9    downgrading of Mr. Chavez's release conditions from home

10   incarceration to a curfew was to help facilitate his ability to

11   attend his myriad doctors' appointments that were just becoming

12   very difficult for pretrial to arrange under a home

13   incarceration regime.

14           And I'm happy to report that Mr. Chavez has had

15   absolutely no problems whatsoever on pretrial release over the

16   past 20 months.  He's an outstanding releasee who maintains an

17   excellent rapport with Marlon Ovalles of pretrial services.

18   Again, it's been pretrial who has urged me to ask the Court to

19   downgrade his bail in order to facilitate his ability to get

20   the medical treatment he needs.  I think it's axiomatic that

21   he's not going to receive anything remotely close to that kind

22   of care if he were to be detained at MDC and that putting him

23   in that kind of environment would pose an unnecessary risk to

24   his life, especially given his age and the likely reemergence

25   of his prostate cancer.

NBRJCHAP

1          So it's for those reasons that are specific to

2    Mr. Chavez that we submit there is an exceptional basis or

3    exceptional reasons justifying his continued release on bail

4    pending sentencing.  And I have all the confidence that

5    Mr. Chavez will continue to scrupulously adhere to his bail

6    conditions as he has over the past 20 months.

7          THE COURT:  Okay.  As it happens — I think you know

8    this — I have under advisement a request to keep another client

9    of yours out on bail under similar circumstances, *United States*

10   *v. Irizarry*, I think 23 Cr. 60 is the docket number.  In that

11   case you made arguments concerning the conditions in the MDC on

12   top of individual circumstances.  Do you incorporate those

13   arguments by reference here?

14         MR. DALACK:  I do, your Honor, and specifically would

15   incorporate the arguments I made about the approach that Judge

16   Engelmayer has taken just across the hall, that if a person has

17   been doing well on bail and there's no indication that he poses

18   or she poses a risk to public safety or a flight risk, that

19   detaining that person at the MDC, given the decrepit conditions

20   there, would be inappropriate and that the conditions at the

21   MDC themselves create a basis to continue a person's detention.

22         I think without trying to argue against myself in

23   connection with my representation of Mr. Irizarry, I think here

24   he's differently situated than Mr. Irizarry.  So to the extent

25   Mr. Irizarry's case is a closer call, given his record and

NBRJCHAP

1    another circumstances, those concerns aren't present with

2    Mr. Chavez.  He's never been in trouble before.  This offense

3    conduct is really aberrational.  He's an old man who requires

4    intensive medical care.  He's certainly not going to get it at

5    the MDC.  And your Honor should, in the interest of justice,

6    continue his bail pending sentencing.

7            THE COURT:  Mr. Jones, let me hear from you on the MDC

8    front.  There was a meeting recently of the Criminal Justice

9    Advisory Board, at which the, I think, associate warden of the

10   MDC reported the most recent statistic was that the custodial

11   staff was at 48 percent of its full staffing level.  I don't

12   know if you know that number offhand or perhaps I can ask you

13   to find it out, but my impression -- I mean, I've been dealing

14   with issues relating to the MDC for years.  And the repeated

15   explanation — and certainly understandable — is that there's

16   just chronic and severe staffing shortages.  And that's all

17   well and good, but it does strike me that there's a pretty

18   strong argument for not putting additional people, that if the

19   Department of Justice and the BOP can't get that issue under

20   control and solve it, that the only other solution is to reduce

21   or at least not add to the prison population unnecessarily.

22   And in that regard, somebody who he has been compliant strikes

23   me as a pretty good candidate for not being added to that

24   number.

25            So can you address that issue separate and apart from

NBRJCHAP

anything specific to Mr. Chavez?

          MR. JONES:  Your Honor, I certainly can't cite the
staffing level.  What I know is mostly from news reporting, but
I do understand that it is staffing issues that do frequently
drive or occasionally drive, whatever the right adjective is,
lockdowns or various other issues at the MDC.  And I recognize
that is a concern that the Court has.

          As to Mr. Chavez specifically, I think insofar as
Mr. Dalack identified a host of physical ailments and certain
requirements that he has for medical treatment that I think
we'd all probably agree won't be addressed the same way at MDC
versus continuing bail, I don't really have a position there.
I leave it to the Court whether that's exceptional or not.  I
understand the Court's point about MDC conditions broadly,
absent specific circumstances of the defendant.  I don't know
that that rises to the level of exceptional, but I recognize
that's not the only thing that's present here.

          You know, same with the mitigation about the way
Mr. Chavez was trying to fool himself like it's not a crime if
I don't look in the box, I think that's probably most
appropriately addressed at sentencing and probably wouldn't
accept that as an exceptional circumstance, but I understand
that is just one piece of a larger application being made.

          THE COURT:  All right.  So I think there's a pretty
strong argument for exceptional circumstances in Mr. Chavez's

NBRJCHAP

1    individual case, given his medical condition, but I'm going to,

2    strictly speaking, reserve judgment and ask Mr. Jones to get me

3    some information that may be helpful to me in evaluating the

4    application more broadly.

5            That is to say by Thursday I want a letter from the

6    government telling me, number one, what the current staffing

7    levels are at the MDC, both in custodial staff and also in the

8    medical staff.  Given Mr. Chavez has various medical conditions

9    that would require care, I think that is relevant.  I want to

10   know what the current inmate population is and, therefore, what

11   the ratio is between the two.  And I'd like those same figures,

12   basically, let's say at six-month intervals for the last three

13   years just to have a sense of whether and to what extent the

14   staffing level has gotten worse, better, or remained the same.

15           Because, again, my impression is that this has been a

16   chronic and severe problem, that it is, indeed, the root cause

17   of any number of problems at the MDC.  And unless and until it

18   is fixed — and that doesn't seem to be likely any time soon —

19   that there are other things that perhaps need to be done and

20   that may bear on the application that's being made.

21           Okay, Mr. Jones?

22           MR. JONES:  Yes, your Honor.

23           THE COURT:  All right.

24           MR. JONES:  Just making sure I heard the Court's

25   request.  I will get the transcript, but custodial, medical

NBRJCHAP

1    percentage staffing levels, inmate population, and looking

2    backwards every six months back three years?

3                THE COURT:  Correct.

4                So just to be clear, I want to know what the total

5    staffing level is slated at, that is what it's budgeted for,

6    what percent they're currently at.  That should include and

7    reflect any medical leave, any military leave, any leave of

8    that sort, so any sick leave.  Because I think that part of the

9    problem is that these numbers are compounded by frequent sick

10   calls and officers who simply don't show up, so what the actual

11   attendance is on an average basis at the moment and that

12   comparable number going back again at six-month intervals for

13   three years.

14               And I'm guessing that the Bureau of Prisons can get

15   you that information relatively easily.  And if it makes sense

16   to report it in some other way, I'm not wedded to that

17   particular definition or description.  But fundamentally, I

18   want to know how many people are actually on staff working and

19   whether the problem has gotten worse, remained the same, or

20   gotten any better.  Okay?

21               MR. JONES:  Understood.

22               THE COURT:  And custodial staff and medical staff.

23               Mr. Dalack?

24               MR. DALACK:  Thanks, Judge.

25               I would just ask to receive the same information, of

1    course, as well, and have the opportunity to be heard further,

2    to the extent the Court wishes.

3    THE COURT:  It will be filed on the docket, so you and

4    the rest of the world will get it, unless there's a security

5    reason to do otherwise, in which case the government can make

6    an application to me, but certainly, I think there's a public

7    interest in that information.  And in terms of response, I'll

8    leave it to you.  If you, upon receiving it, feel that there's

9    a need for a response, you can make an application.  But let me

10   say that without getting advance permission for a response,

11   then we'll leave it there.  Okay?

12   MR. DALACK:  Thanks, Judge.

13   THE COURT:  All right.  And I guess to the extent that

14   you're familiar with these issues, are there any other data

15   that you think might be helpful to me in evaluating the

16   situation?

17   MR. DALACK:  Just in connection with my representation

18   of Mr. Irizarry in 23 Cr. 60, I had appended to the opening

19   letter a memorandum from the union representative for the staff

20   at MDC Brooklyn, who lamented the severe staffing shortages.

21   Anecdotally, I can say that my understanding is at any given

22   point there's one correctional officer responsible for three

23   units and that that results in sort of indefinite lockdowns,

24   that it's even worse on the weekends.  So that routinely people

25   who are detained at the MDC are not allowed out of their cells

NBRJCHAP

1    pretty much at a minimum three days of the week, Friday,

2    Saturday, Sunday, given the severe staffing shortages there.

3         I also want to say, too, that notwithstanding whatever

4    staffing might be available at MDC Brooklyn in their medical

5    unit, I'm not aware of the MDC being equipped to handle

6    Mr. Chavez's specific needs, especially as they pertain to

7    monitoring his PSA levels and helping him receive chemotherapy

8    and treatment for his cancer, should his oncologist believe

9    that's warranted.  And certainly, the Court can have no

10   confidence whatsoever that the MDC will make Mr. Chavez

11   available for any of his medical appointments.

12        I think I had mentioned in my opening letter on behalf

13   of Mr. Irizarry, a case involving another client of mine,

14   Mr. Raul Acosta, who is still awaiting reconstructive surgery

15   for his face, despite numerous orders from various judges in

16   this district requiring the MDC to promptly make that available

17   to him.  It's gotten to the point where, as I mentioned in that

18   letter, his face has healed improperly and they now have to

19   re-break it in order to perform reconstructive plastic surgery.

20   So I certainly came prepared with a number of anecdotal reasons

21   as to why the MDC is a miserable place to be for anybody, but

22   especially for somebody who clearly does not pose a risk to

23   public safety or a flight risk.

24        Thank you, Judge.

25        THE COURT:  All right.  Thank you.

NBRJCHAP

1          So as I said, I will reserve judgment, although

2    certainly I think that there's a pretty compelling argument

3    here and just want to get a complete record before I rule on

4    it.  Unless and until I say otherwise, Mr. Chavez will remain

5    free subject to the conditions of release that he has been on

6    to date.

7          Mr. Chavez, let me stress a couple things to you.

8    First, you must continue to comply with the conditions of your

9    release.  If you don't, then that may affect your release and

10   leave me to remand you, separate and apart from what I've just

11   discussed with the lawyers.

12          Do you understand that?

13          THE DEFENDANT:  Yes.

14          THE COURT:  And in addition, I will tell you that if

15   you violate the terms of your release, that may also have

16   significance to me in deciding what sentence to impose upon you

17   when it comes time for sentencing.

18          Do you understand that?

19          THE DEFENDANT:  Yes.

20          THE COURT:  All right.  And in addition, you must be

21   here in this courtroom on the date and time that I set for

22   sentencing.  That is March 7 of next year at 3:00 p.m.  You

23   should stay in touch with Mr. Dalack and he'll let you know if

24   that date, time, and location changes.  But unless and until I

25   change it, you must be here for sentencing at that time and on

NBRJCHAP

1    that date.  And if you're not, you may be subject to punishment

2    above and beyond whatever punishment you receive in connection

3    with your plea.

4              Do you understand that?

5              THE DEFENDANT:  Yes.

6              THE COURT:  All right.  Anything else from the

7    government?

8              MR. JONES:  No, your Honor.

9              THE COURT:  From you, Mr. Dalack?

10             MR. DALACK:  No, Judge.  Thank you very much.

11             THE COURT:  All right.  Thank you very much.

12             We are adjourned.

13             (Adjourned)

14

15

16

17

18

19

20

21

22

23

24

25